IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Magistrate Judge Boyd N. Boland

Civil Action No. 04-cv-01881-WYD-BNB

CHARLES M. KOVACS,
CHRISTINE H. BUKALA,
DANNY M TRAMMEL,
ROBERT C. McGRATH, and
JOSEPH J. RAGUSA,

Plaintiffs,

v.

THE HERSHEY COMPANY, a Delaware corporation,

Defendant.

_____

# ORDER

_____

This matter is before me on the following:

(1)     **Plaintiffs' Motion to Compel Answers to Third Set of Written Discovery**

[Doc. # 284, filed 4/10/2006] (the "Motion to Compel Third Set"), which is DENIED;

(2)     **Plaintiffs' Motion to Compel Deposition of Jennifer Chung** [Doc. # 290, filed

4/13/2006] (the "Motion to Compel Chung Deposition"), which is GRANTED; and

(3)     **Plaintiffs' Motion to Compel Withheld and Redacted Documents** [Doc. # 300,

filed 4/20/2006] (the "Motion to Compel Documents"), which is GRANTED IN PART and

DENIED IN PART, as specified.

## A.  THE MOTION TO COMPEL THIRD SET

The Motion to Compel Third Set raises the issue of how written discovery requests with

subparts are to be counted.  Because I agree that the defendant has counted the discovery

requests correctly, the Plaintiffs' Third Set of Written Discovery (the "Third Set") exceeds the

number of written discovery requests allowed by the Scheduling Order.  Consequently, the

Motion to Compel Third Set is DENIED.

The Scheduling Order [Doc. # 32, filed 1/21/05] limited written discovery to 50

interrogatories per side, "including distinct subparts," and to 50 requests for production per side,

"including distinct subparts."  *Scheduling Order*, ¶¶7(k)(3)-(4).

## 1.  Interrogatories

The plaintiffs' first discovery requests contained four separately numbered interrogatories.

The plaintiffs' second discovery requests contained 24 separately numbered interrogatories.  The

defendant contends, however, that Interrogatories No. 7, 9, 13, 18, and

20 (Second Set) contain distinct subparts which should be separately counted.  According to the

defendant, the second discovery requests actually contain 49 distinct questions.  I agree.

In <u>Kendall v. GES Exposition Services, Inc.</u>, 174 F.R.D. 684 (D. Nev. 1997), the court

adopted the following test for counting written discovery requests:

> [I]nterrogatory subparts are to be counted as part of but one
> interrogatory . . . if they are logically or factually subsumed within
> and necessarily related to the primary question.
>                    *    *    *
> However, the more difficult question is determining whether the
> subparts are "logically or factually subsumed within and necessarily
> related to the primary question."
>                    *    *    *
> Probably the best test of whether subsequent questions, within a
> single interrogatory, are subsumed and related, is to examine
> whether the first question is primary and subsequent questions are
> secondary to the primary question.  Or, can the subsequent question
> stand alone?  Is it independent of the first question?  Genuine
> subparts should not be counted as separate interrogatories.
> However, discrete or separate questions should be counted as

separate interrogatories, notwithstanding they are joined by a
conjunctive word and may be related.

Id. at pp.685-86 (internal quotations and citations omitted).

**Plaintiffs' Interrogatory No. 7 (Second Set)** states:

Attached as Exhibit B is a memorandum dated July 10, 2003, from
David J. West to [sic], which attaches various hierarchical charts in
the so-called realigned sales force.  With regard to these charts:

a.   Identify the date of birth and length of employment with HFC of
each person identified on these charts as of the time the charts were
created;

b.   Identify each person considered for each position on these
charts, including the job title, date of birth and length of
employment with HFC of each such person; and

c.   Identify and describe the hierarchical structure of the United
States sales force and the employees within such structure,
including date of birth and length of employment with HFC,
immediately preceding the 2003 "realignment" of the sales force.

Applying the test announce in Kendall, it is obvious that Interrogatory No. 7 (Second Set)
is made up of three different and distinct questions.  Each of the three subparts can stand alone,
and none of the subparts are dependent on the other subparts.  Interrogatory No. 7 (Second Set)
counts as three interrogatories.

**Plaintiffs' Interrogatory No. 9 (Second Set)** states:

Identify all facts and documents you contend support each of the
"Affirmative Defenses" identified at pages 11 through 14 in the
"Answer or Defendant Hershey Foods Corporation."

Hershey's Answer contains 21 affirmative defenses, but Hershey argues in its response to
the Motion to Compel Third Set that it asserts 18 affirmative defenses in its Answer to First
Amended Complaint.  I agree with Hershey that Interrogatory No. 9 (Second Set) constitutes 18

3

separate questions.  As the court stated in <u>White v. Cinemark USA, Inc.</u>, 2005 WL 3881658

(E.D. Cal. March 28, 2005) at *3:

> In Interrogatory 12 . . . the Plaintiff requests that the Defendant set forth each and every fact relating to its 21 affirmative defenses. . . . The court finds that each affirmative defense should be treated as a separate interrogatory, since each defense may be both factually and logically different.

The propriety of the counting rule articulated in <u>White</u> with respect to affirmative defenses

is certainly correct.  It cannot reasonably be argued that a statement of the facts supporting the

defense of "failure to exhaust administrative remedies," Answer of First Amended Complaint

[Doc. # 109, filed 6/22/05] Fourth Defense at p.32, is in any way primary to a statement of the

facts supporting the defense of "failure to mitigate damages."  <u>Id</u>. at Fifth Defense.  The two

questions are not dependent on one another, but clearly stand alone.  Interrogatory No. 9 (Second

Set) counts as 18 interrogatories.

**Plaintiffs' Interrogatory No. 13 (Second Set)** states:

> In Exhibit A, on page 3, you contend as follows:
>
> The Selection Team conducted the selection process using a disciplined approach.  First, the pool of minimally qualified Sales employees was determined for each position at issue.  The Selection Team then ascertained essential job-related dimensions for each position.  The Selection Team then reviewed in detail and on an individualized basis the pool of minimally qualified candidates to identify candidates who possessed and/or excelled in the dimensional qualifications.  Final candidates then were further culled among those who had the requisite dimensional qualifications.

With regard to those contentions:

a.   Identify and describe how the Selection Team determined the pool of minimally qualified candidates for each position before they ascertained the essential job-related dimensions for each position; and

b.   Identify and describe the data and information concerning the performance of each employee the Selection Team relied upon as it undertook each of these steps.

The introductory statement preceding the specific requests for information in Interrogatory No. 13 certainly establishes a relationship between the two distinct pieces of information which the interrogatory seeks.  That relationship does not transform the two distinct requests of Interrogatory No. 13 into one request, however.  As the court explained in <u>Kendall</u>:

[T]he more difficult question is determining whether the subparts are "logically or factually subsumed within and necessarily related to the primary question."  If the questions are relevant to the case, it could be argued that all the interrogatories are "related."  If that were the case, then all the interrogatories would only be counted as one and there could never be an excessive number.

174 F.R.D. at 685.  The test is not whether the subparts are related; they almost certainly are in some respect.  The test is whether the subparts stand alone and are independent.

I find that the two subparts of Interrogatory No. 13 (Second Set) seek distinct and independent (though related) information, and constitute two interrogatories.

**Plaintiffs' Interrogatory No. 18 (Second Set)** states:

Attached as Exhibit D is a list of all HFC employees who were eligible for the 2003 ERP according to you.  With regard to the persons identified on Exhibit D:

a.   Identify for each person his or her date of birth;

b.   Identify the title, grade and "total compensation," as that term is used by you, of the position[s] each person held with HFC as of June 1, 2003;

c.   Identify each position for which each person on Exhibit C [sic] was considered in the realigned Sales force;

d.   Identify the date of birth and length of employment with HFC of each person you placed in each position for which each employee on Exhibit C [sic] was considered with regard to the realigned sales force; and

e.   Identify each and every document reflecting the Selection Team's consideration of each person on Exhibit C [sic] for each position for which he or she was considered for purposes of the realigned sales force.

Here, as in the case of Plaintiffs' Interrogatory No. 13 (Second Set), the requests contained in Interrogatory No. 18 are related, but they also are distinct and independent of each other.  Interrogatory No.18 (Second Set) counts as 5 interrogatories.

**Plaintiffs' Interrogatory No. 20 (Second Set)** states:

In Exhibit A, on page 11, you contend as follows:

Mr. Montagne for [sic] was considered for a number of positions in a deliberative and fair manner.  After it became clear that Mr. Montagne would not have a position after the realignment, the Company made efforts to provide Mr. Montagne with sufficient information to make an informed choice on whether or not to elect to participate in the ERP.

As to these contentions:

a.   Identify and describe the efforts undertaken by HFC to "provide Mr. Montagne with sufficient information to make an informed choice on whether or not to elect to participate in the ERP"; and

b.   Is the contention that "after it became clear that Mr. Montagne would not have a position after the realignment, the Company made efforts t provide Mr. Montagne with sufficient information to make

6

an informed choice on whether or not to elect to participate in the
ERP" a reference to the telephone conversation on or about June
18, 2003 between David J. West and Mr. Montagne, with Mr.
Smuda and Mr. Wells also on the line?

Applying the <u>Kendall</u> test, I find that Plaintiffs' Interrogatory No. 20 (Second Set) asks

two distinct and independent questions and should count as two interrogatories.

The plaintiffs used four interrogatories in their first set of discovery requests and 49

interrogatories in their second set.  The plaintiffs have exceeded the total number of

interrogatories allowed by the Scheduling Order.  They are not entitled to responses to any of the

interrogatories contained in the plaintiffs' third set.

**2.  Requests for Production of Documents**

The plaintiffs' first discovery requests contained four requests for production of

documents, and their second discovery requests contained an additional 19 production requests,

for a total of 23 requests for production.

The plaintiffs' third set of discovery contains 27 separately numbered production requests.

The defendant contends, however, that Production Requests No. 26, 29, 31, 32, 37, 42, 43, 44,

45, 46, and 48 contain distinct subparts which should be separately counted.  According to the

defendant, the third discovery request actually contains 104 production requests, for a total of 131

production requests in the three sets.  Again, I agree.

For example, Production Request No. 26 (Third Set) requests the following:

For 2000 through the present, please produce all **[1]** disparate
impact studies or analyses, **[2]** utilization and/or under-utilization
studies or analyses, **[3]** "EEO-1s," **[4]** affirmative action plans,
studies or analyses, and all **[5]** gender or race-based initiatives
undertaken by you to increase diversity in your workforce.

The defendant correctly asserts that this is not a single request, but five.  I agree, as noted by the bracketed numbering.  Applying the distinct subpart analysis of <u>Kendall</u>, it is obvious that the distinct requests are not dependent upon one another, but that they each can stand alone.

Applying the <u>Kendall</u> analysis to the disputed production requests leads me to conclude that the following production requests contain multiple distinct subparts which must be separately counted:

| Production Request No. | Distinct Subparts |
|---|---|
| 26 | 5 |
| 29 | 2 |
| 31 | 2 |
| 32 | 2 |
| 37 | 6 |
| 42 | 5 |
| 43 | 54 |
| 44 | 3 |
| 45 | 3 |
| 46 | 4 |
| 48 | 2 |
| **Total** | **88** |

On or before July 21, 2006,, the plaintiffs shall designate 27 of the distinct subparts contained in their third production request, and the defendant shall respond to the designated requests on or before August 7, 2006.  If the plaintiffs fail to make the required designation, the defendant shall respond to the first 27 distinct subparts within the time allowed.

### 3.  Request for Additional Discovery

Anticipating that I might accept the defendant's approach to counting the discovery requests, the plaintiffs alternatively request leave to exceed the discovery limits imposed by the Scheduling Order.  A scheduling order, however, "shall not be modified except upon a showing of good cause."  Fed. R. Civ. P. 16(b).  In this case, the plaintiffs have failed to establish good cause sufficient to justify the additional discovery requested.

In an attempt to establish the good cause necessary to obtain an enlargement, the plaintiffs assert, first, that the disputed discovery is "essential to [p]laintiffs' responses to Hershey's motion for summary judgment."  Motion to Compel Third Set at ¶11.  Second, the plaintiffs argue that they were misled by the defendant with respect to the distinct subpart issue:

> But more important is that Hershey's failure to timely assert these objections implicates issues of fairness and equity.  Had Hershey complied with its obligations to timely object Plaintiffs would have been on notice long ago that Hershey counts differently than the Plaintiffs, and how the law allows.  In that case Plaintiffs would have sought timely resolution of the subpart counting controversy and received timely judicial guidance before serving their final, important set of discovery.  Instead, Plaintiffs were whipsawed, only learning of the objections and Hershey's technical arguments when it was too late.

Motion to Compel Third Set at ¶16.

The plaintiffs' claim of surprise is disingenuous.  The issue of distinct subparts came up during the scheduling conference and was addressed in the Scheduling Order.  *Scheduling Order*, ¶¶7(k)(3)-(4).  The subparts at issue in these discovery requests are obviously distinct, and do not present a close question; the plaintiffs acted unreasonably when they combined into single numbered discovery requests numerous distinct subparts.  The defendant did timely object, as

soon as the plaintiffs served their third set of discovery which caused the plaintiffs to exceed the allowed number of distinct subparts.

The plaintiffs argue that the disputed discovery is essential in responding to the defendant's motion for summary judgment. They have been allowed extensive discovery, however. In addition to the 50 interrogatories and 50 production requests permitted, the plaintiffs conducted a Rule 30(b)(6) deposition of the defendant in which the plaintiffs specified no fewer than 103 categories of inquiry. *Plaintiffs' Motion for Sanctions as to Hershey's Multiple Violations of Rule 30(b)(6)* [Doc. # 125, filed 7/6/2005] at Exh.A. Other discovery also has occurred. The plaintiffs have been afforded adequate discovery to prepare their case. Good cause has not been established to substantially expand the previously imposed limits.

## B.  MOTION TO COMPEL CHUNG DEPOSITION

Jennifer Chung is a lawyer with the law firm of Seyfarth Shaw LLP in Washington, D.C. She is one of several lawyers from two law firms who have entered appearances as counsel of record for the defendant.

In addition to serving as one of the defendant's trial counsel, Ms. Chung also participated in the events which underlie this action. According to the plaintiffs:

> As noted in recent proceedings, Hershey says that the handwritten notes of two attorneys, Mary Oates Walker, Hershey's in-house counsel, and Jennifer S. Chung, an attorney of record in this case, comprise the "best record or the selection decisions" at issue in this litigation.
>
>         *    *    *
>
> Ms. Chung was tasked with making a record of the selection process meetings, as well as other tasks . . . . In these particular meetings, either Ms. Chung or Ms. Walker were tasked with keeping this selection decision record, but they were not both in attendance at the same meetings.

*Plaintiffs' Response to Hershey's Motion for Protective Order* [Doc. # 196, filed 10/31/2005] at

pp.13-14.  Ms. Walker has been deposed.  Motion to Compel Chung Deposition at p.2.

The plaintiffs now seek to depose Ms. Chung, arguing:

> In August 2005 Plaintiffs found buried deep within a four thousand
> plus page Hershey document production an attorney-client
> document which seems to make clear that Plaintiffs' core
> contention--that Hershey designed and implemented an involuntary
> retirement plan it knew was illegal--is absolutely true.  Plaintiffs
> also found in the same production attorney-client notes making
> clear that the decision to provide impermissible age data to the
> selection team members was made or sanctioned by Hershey's
> attorneys, and that age was considered a relevant criterion on which
> to compare candidates.
>
> In both cases the notes were authored by defense team member
> Jennifer Chung summarizing attorney-client communications
> between Ms. Chung and in-house counsel Mary Oates Walker.
> Plaintiffs had hoped that Ms. Walker's deposition testimony would
> suffice as to the substance, context and evidentiary foundation of
> these absolutely critical smoking gun documents.  However, when
> Plaintiffs deposed Ms. Walker she claimed to have no memory of
> either of these memorialized communications with Ms. Chung.  She
> also claimed that the notes themselves did not refresh her
> recollection of these important communications, and even that it
> was not possible for her to determine what she was discussing with
> Ms. Chung based on reviewing these notes.  This leaves only Ms.
> Chung to testify about the substance and context of these
> communications.

Motion to Compel Chung Deposition at p.2.

The first notes at issue are dated April 29, 2003, and reflect a telephone call between Ms.

Walker and Ms. Chung.  Id. at Exh.A.  The notes were written by Ms. Chung.  Id., Exh. D at p.32

lines 4-5.  They state in relevant part:

> Plan to let go a lot of [employees].  They want to come [to]
> severance plan similar to the [Enhanced Mutual Severance Plan]
> and [Early Retirement Plan] from last year [2001].

--But, here [it] won't be voluntary.  Exit incentive [because] these
employees] will have no place to go if they don't accept severance
package (whereas the ERP/EMSP people [could] choose to stay or
leave).

--If group [termination] program, then Older Workers' Benefit
Protection Act] regs [apply]. [Demographic] information (age) of
people selected must be given to [employees].

--could expose company to age claim risk
Suggested course: get the data and do some adverse impact
analyses to see the extent of the risk.

Motion to Compel Chung Deposition at p.4.

The plaintiffs argue that these notes are a "smoking gun" because they show that

"Hershey, with the aid of Ms. Walker and Ms. Chung, designed an illegal involuntary retirement

plan that they knew would expose Hershey to age discrimination claims, so Ms. Chung and Ms.

Walker decided to try to reduce the company's exposure by not complying with the OWBPA."

Id. at p.4.

When asked at her deposition about these notes and any related telephone conversation

with Ms. Chung, Ms. Walker could supply no meaningful information.  Rather, she testified:

Q.  (BY MR. FEOLA) Is this the notes of a telephone call Ms.
Chung had with you on April 29th of 2003 at approximately 5:45
p.m. concerning the sales reorganization?

A.  I can't say for sure, Mr. Feola.  They're not my notes.

Q.  Well, then, give us your best guess.

MR. LIPINSKY: Objection to form.

THE WITNESS: I don't know.

Q.  (BY MR. FEOLA) You don't know what about the document?

12

A.  You said, this is--are these the notes of a telephone call with me on 4/29 at 5:45 p.m.  They're not my notes, so I can't say that that is the case.

                               *    *    *

Q.  (BY MR. FEOLA)  Did you have a telephone call with Ms. Chung on April 29th of 2003?

A.  I don't recall.

                               *    *    *

Q.  (BY MR. FEOLA) Does this exhibit refresh your recollection about a phone call that you had with Ms. Chung on April 29th of 2003.

A.  No.

                               *    *    *

Q.  (BY MR. FEOLA) Did you ever discuss with Ms. Chung the fact that giving the demographic information, including age, to those folks selected could expose the company to an age-claim risk?

MR. LIPINSKY: Objection to form.

THE WITNESS: I can't answer without disclosing attorney/client-privileged communication.

Q.  (BY MR. FEOLA) Do you see on Exhibit 121, the document that you folks produced to us, it says, "could expose company to age claim risk": do you see that on the document?

A.  Yes.

Q.  What is that a reference to ?

MR. LIPINSKY: Objection to form.

THE WITNESS: These aren't my notes, Mr. Feola.

Q.  (BY MR. FEOLA) You have already said that.

A.  I don't know.

Motion to Compel Chung Deposition, Exh. D at p.32 lines 9-20; p.33 lines 14-25; p.36 lines 7-23.

The second set of notes, dated three days later (May 2, 2003), reflects a telephone call between Ms. Chung, Ms. Walker and Martha Restrepo, a Hershey employee.  Motion to Compel Chung Deposition, Exh. B.  These notes also were written by Ms. Chung.  *Defendant's Response to Plaintiffs' Motion to Compel Deposition of Jennifer Chung* [Doc. # 338, filed 5/17/2006] (the "Response") at p.7.  They state in relevant part:

> 52 individ[ual]s--met min[imum] qualif[ications] re: experience
> "Area Sales Director" top position under Dave [West]'s Direct
> Reports
>            *   *   *
> Thinking about [a]nother ERP/ESP w/ enhanced sev[erance]
> package
>            *   *   *
> 52--had exp[erience] that could give them--in role
> Started w/ 52 & eliminated
> Dimensions
> Came up w/ 14 pot[ential] candidates
>            *   *   *
> Make spreadsheet List the 14 people & the remaining 52-14 & put
> in info[rmation] useful in doing comparison

Motion to Compel Chung Deposition at p.5 and Exh.B.

The plaintiffs argue that "Ms. Chung then created that spreadsheet, and included as the 'information useful in doing comparison' the gender, race, **_birth date_** and **_service date_** of the ASD candidates, which included Mr. Montagne, Mr. Leger, Ms. Bukala and Mr. Kavocs."  Id. at p.5 (original emphasis).

14

Ms. Walker lacked any information about the May 5 notes, testifying:

> Q.  Is it your testimony under oath that the notes, particularly those on page 2 of Exhibit 160, have no relationship whatsoever to Tab 2 of Exhibit A?
>
> MR. LIPINSKY: Objection to form.
>
> THE WITNESS: It is my testimony that I can't know what these notes refer to because they are not my notes.  It is the case that these notes refer to numbers that don't match the numbers on Tab 2.
>
> *   *   *
>
> Q.  (BY MR. FEOLA) You don't know whether a document came out of this discussion?
>
> MR. LIPINSKY: Objection to form.
>
> THE WITNESS: They are not my notes, so I don't know.
>
> Q.  (BY MR. FEOLA) Move to strike as nonresponsive.
>
> Do you know whether a document was produced by Ms. Chung consistent with what's written on Exhibit 2 of page 160 on or around the time you folks have this discussion?
>
> MR. LIPINSKY: Objection to form.
>
> THE WITNESS: Mr. Feola, I don't know what these notes refer to.  And you are asking me a question that I cannot possibly answer.
>
> All--All that I can do is, you know, look at the notations here.  It says 52 minus 14, list the 14 people and the remaining 52, and there are more than that number of individuals listed on Exhibit Two.
>
> So Exhibit Two does not appear to be the document that was produced as a result of this conversation.
>
> Q.  (BY MR. FEOLA) And you are deducing that from numbers alone, correct?

> A.  These are not my notes, Mr. Feola.  I can't add context when I
> don't--when they--I didn't draft this.

Motion to Compel Chung Deposition, Exh. D at p.206 line 22 through p.207 line 4; p.208 lines 1-25.

In essence, the plaintiffs have identified notes by Ms. Chung dated May 2, 2003, which indicate that a spreadsheet would be created concerning 52 candidates for specific positions and that the spreadsheet was to "put in info[rmation] useful in doing comparison."  Id. at p.5.  The plaintiffs have identified a spreadsheet, which is attached as Exhibit C to the Motion to Compel Chung Deposition, which they believe is the spreadsheet referred to in the May 2 notes.  The spreadsheet is especially important, the plaintiffs claim, because it lists the candidates' dates of birth, and could be evidence that age was considered in making selection decisions.  The plaintiffs have been unable to confirm their suspicion that Exhibit C is the spreadsheet referred to in the May 2 notes, however, and the defendant argues in its Response that Exhibit C was not created as a result of the May 2 telephone call.  *Response* at p.7.

In Shelton v. American Motors Corp., 805 F.2d 1323, 1327 (8th Cir. 1986), the Eighth Circuit Court of Appeals expressed its displeasure with the increasing practice of deposing opposing counsel, stating:

> In recent years, the boundaries of discovery have steadily expanded,
> and it appears that the practice of taking the deposition of opposing
> counsel has become an increasingly popular vehicle of discovery.
> To be sure, the Federal Rules of Civil Procedure do not specifically
> prohibit the taking of opposing counsel's deposition.  We view the
> increasing practice of taking opposing counsel's deposition as a
> negative development in the area of litigation, and one that should
> be employed only in limited circumstances.

> Undoubtedly, counsel's task in preparing for trial would be much
> easier if he could dispense with interrogatories, document requests,
> and depositions of lay persons, and simply depose opposing counsel
> in an attempt to identify the information that opposing counsel has
> decided is relevant and important to his legal theories and strategy.

(Internal notes and citations omitted.)  The Eighth Circuit recognized that the deposition of

opposing counsel may be appropriate under certain circumstances, however, and held:

> We do not hold that opposing trial counsel is absolutely immune
> from being deposed.  We recognize that circumstances may arise in
> which the court should order the taking of opposing counsel's
> deposition.  But those circumstances should be limited to where the
> party seeking to take the deposition has shown that (1) no other
> means exist to obtain the information than to depose opposing
> counsel . . .; (2) the information sought is relevant and
> nonprivileged; and (3) the information is crucial to the preparation
> of the case.

Id.  The Tenth Circuit Court of Appeals cited with approval and applied the Shelton factors in

Thiessen v. General Capital Corp., 267 F.3d 1095, 1112 (10th Cir. 2001).

In this case, I find that the deposition of Ms. Chung is necessary under the Shelton factors

and must be allowed.  First, no other means is available for the plaintiffs to obtain the information.

Ms. Walker, another participant in the conversations, was unable even to verify that the notes

"concerned" conversations between herself and Ms. Chung, and she certainly could not explain

the contents of the notes.[1]

Second, the contents of the notes certainly are relevant to the plaintiffs' claims.  Both sets

---

[1] In view of Ms. Walker's deposition testimony, I do not find that the deposition of Ms.
Chung should be denied because the plaintiffs failed to question Martha Restrepo about the notes.
Ms. Restrepo did not participate in the telephone call on April 29, 2003, and can provide no
information about it.  Although she did participate in the May 2 conversation, the notes the
plaintiffs are concerned with were made by Ms. Chung, not Ms. Restrepo, and there is no reason
to believe that Ms. Restrepo would have any greater knowledge about those notes than did Ms.
Walker.

of notes appear to concern the manner in which the defendant was making employment decisions and, if the plaintiffs' assumptions are correct, may indicate that the defendant considered age in making those decisions.

Finally, the information is critical to the preparation of the plaintiffs' case. Here, it is not disputed that Ms. Chung participated in the historical events underlying the claims in the lawsuit. She is not merely trial counsel. The plaintiffs have identified two sets of notes concerning telephone conversations which concern the decision making process utilized by the defendant and, on their face at least, may reasonably be interpreted to indicate that the defendant may have considered age in making its employment decisions. Those facts are crucial to an age-based discrimination case like this one.

Accordingly, I will grant the Motion to Compel Chung Deposition. The deposition must be completed on or before August 18, 2006. Ms. Chung shall make herself available for deposition in Denver, Colorado, in my jury deliberation room at the Alfred A. Arraj United States Courthouse at a date and time as the parties may agree. The deposition shall not exceed four hours and shall be taken in a single day. The parties are directed to contact my secretary at 303-844-6408 to confirm the availability of the jury deliberation room on the date chosen for Ms. Chung's deposition.

## C. MOTION TO COMPEL DOCUMENTS

Finally, the plaintiffs seek an order compelling the production of numerous documents either withheld in their entirety or partially redacted by the defendant based on a claim of attorney-client privilege.

### 1. Failure to List Documents On a Privilege Log

18

The defendant prepared a log of documents withheld from production and provided it to the plaintiffs on June 10, 2005.  Motion to Compel Documents at p.6 n.2.  Subsequently, on August 11, 2005, the defendant produced  "over four thousand pages of documents," id.at p.2, which the plaintiffs describe as follows:

> [T]hese documents essentially are attorney notes and communications surrounding the preparation for and outcome of the personnel selection process Hershey went through under the 2003 realignment, Early Retirement Plan ("ERP"), and Involuntary Severance Plan (ISP) at issue in this litigation.

*Plaintiffs' Motion to Enlarge Time for Expert Disclosures* [Doc. # 165, filed 9/1/2005] at p.2.[2]

After the production on August 11, 2005, the defendant prepared a supplement to its privilege log.  According to the plaintiffs:

> The June 2005 privilege log Hershey produced prior to the August 11, 2005, production is 36 pages in length . . ., but the privilege log Hershey produced after, in October 2005, is 90 pages in length. . . .  Hence, over 50 pages of new entries were added to the privilege log at the same time Hershey produced the over four thousand pages of selection process documents.

Motion to Compel Documents at p.6 n.2.  The plaintiffs claim that the additional documents designated as privileged on the October 2005 log but not included on the June 2005 log should be produced, arguing:

> Hence, it cannot be disputed that Hershey withheld documents prior to August 2005 *and* failed to disclose these critical documents on its privilege log.  It is also indisputable that Hershey then selectively produced thousands of pages of what it has characterized as the "best record of the selection process" in August 2005 *but* withheld hundreds of other related documents

---

[2]As I understand it, the documents produced on August 11, 2005, are the notes of the selection process meetings made by Mary Oates Walker and Jennifer Chung and described on p.10, supra.

concerning the sales realignment, selection process and related severance plans, including the 2003 ERP, which were not previously identified on the privilege log. Having done so, whatever privilege that could exist was waived.

Motion to Compel Documents at p.7 (original emphasis).

The defendant claims that its failure to include numerous documents on its initial privilege log and the large supplementation of that log in October 2005 was innocent and the result of rulings in a related case being litigated in United States District Court for the Eastern District of Texas. *Defendant's Response to Plaintiffs' Motion to Compel Withheld and Redacted Documents* [Doc. # 328, filed 5/10/2006] (the "Response to Motion to Compel Documents") at pp.7-8.

The plaintiffs have known of the additional privileged documents since they obtained the defendant's supplemental privilege log on October 6, 2005. Discovery did not close until four months later, on February 17, 2006. The Motion to Compel Documents was not filed until April 20, 2006, two months after the close of discovery and five months after the plaintiffs became aware of the additional privileged documents.[3]

This case arises under the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. *Final Pretrial Order* [ Doc. # 371, filed 6/30/2006] at p.2. Consequently, federal law provides the governing substantive law. "Where federal law provides the governing substantive

---

[3]Although not a basis for my ruling, I note that the plaintiffs unreasonably delayed raising this issue until five months after the production of the supplemental privilege log and two months after the close of discovery. See Buttler v. Benson, 193 F.R.D. 664, 666 (D. Colo. 2000).

law in a lawsuit, the federal common law of privileges will govern." Everitt v. Brezzel, 750 F.

Supp. 1063, 1066 (D. Colo. 1990).

A waiver of the attorney-client privilege should not be imposed based merely upon a

party's failure to assert the objection within the time provided by the Federal Rules of Civil

Procedure. Pham v. Hartford Fire Ins. Co., 193 F.R.D. 659, 662 (D. Colo. 2000).  To the

contrary, the circumstances under which the late production of a privilege log may result in a

waiver of the attorney-client privilege has been carefully analyzed in numerous cases in this

circuit, and those cases generally require the presence of an unjustified delay, inexcusable

conduct, or bad faith. First Savings Bank v. First Bank System, Inc., 902 F. Supp 1356, 1361 (D.

Kan. 1995), *rev'd on other grounds*, 101 F.3d 645 (10th Cir. 1996).  For example, as the court

explained in Heavin v. Owens-Corning Fiberglass, 2004 WL 316072 at *1-2 (D. Kan. Feb. 3,

2004):

> It is true that Fed. R. Civ. P. 26(b)(5) requires the objecting party
> to expressly make a claim of privilege and to "describe the nature of
> the documents, communications, or things not produced . . . in a
> manner that, without revealing information itself privileged or
> protected, will enable [the] other part[y] to assess the applicability
> of the privilege or protection."  It also is true that failure to follow
> the Federal Rules of Civil Procedure may result in waiver of the
> attorney-client privilege and/or work-product protection.  Although
> this result is not mandated by the federal rules, the Advisory
> Committee contemplated the sanction: "[t]o withhold materials
> without [providing notice as described in Rule 26(b)(5)] is contrary
> to the rule, subjects the party to sanctions under Rule 37(b)(2), and
> may be viewed as a waiver of the privilege. . . ."
>
> Acknowledging the harshness of a waiver sanction, however, courts
> have reserved such a penalty for only those cases where the
> offending party committed unjustified delay in responding to

> discovery.  Minor procedural violations, good faith attempts at
> compliance and other such mitigating circumstances bear against
> finding waiver.

(Internal citations and notes omitted.)

Here, the scope of the plaintiffs discovery requests and the volume of material withheld on a claim of privilege were enormous.  The supplemental privilege log itself is 90 pages long, includes hundreds of entries, and concerns thousands of pages.  The supplemental privilege log was provided to the plaintiffs within two months after the supplemental production of documents, and well before the close of discovery.

Under these circumstances, I find that the defendant acted in good faith and substantially complied with its obligation to prepare and serve its privilege log in a timely manner.  An alternative to the defendant's conduct here, I suppose, would have been a motion by the defendant to delay  producing responsive documents until it could simultaneously provide the privilege log.  I prefer the approach taken here, however: prompt production of the responsive documents followed by a privilege log within a reasonable time thereafter.[4]

The Motion to Compel: Redactions is DENIED insofar as it requests an order compelling the production of all of the documents on the October 2005 privilege log that were not previously listed on the privilege log served in June 2005.

## 2.  Waiver of the Attorney-Client Privilege By Disclosure

The plaintiffs have identified documents produced by the defendant, which the plaintiffs characterize as "a series of attorney notes and attorney-client communications" and which the

---

[4]Apparently all parties engaged in the preferred practice of producing responsive documents first and providing a privilege log within a reasonable time thereafter.  <u>See</u> *Response to Motion to Compel Documents* at p.7 n.3.

plaintiffs claim contain information subject to the attorney-client privilege.  Motion to Compel

Documents at p.8.  Copies of the disclosed documents are attached to the Motion to Compel

Documents as Exhibits G through U.

The plaintiffs claim that as a result of the defendant's disclosure of Exhibits G through U,

the defendant waived the attorney-client privilege with respect to 15 categories of information,

arguing:

> Clearly, Hershey has voluntarily produced attorney-client materials
> and communications broadly covering the 2003 sales force
> restructuring, the 2003 sales force severance plans, the re-design of
> the sales force, the elimination of certain positions, criteria to be
> used for employee selections, data to provide the selection team
> members, the rationale for decisions concerning candidates, ERP
> eligible employees, communications with ERP eligible employees,
> the involuntary nature of the ERP,  the purposeful decision to
> destroy documents during the process,  the destruction of
> documents after the litigation started,  the risk of age discrimination
> claims,  the decision to assess the extent of the risk,  the decision to
> conduct adverse impact analyses, and the use of age data during the
> purportedly nondiscriminatory selection process.  Within each of
> these broad areas Hershey voluntarily disclosed highly detailed,
> specific attorney-client information.
>
> Though Hershey has selectively produced attorney-client
> information in these categories it has withheld hundreds of other
> attorney-client documents on these very same topics.  By
> voluntarily producing some, but not all, attorney-client information
> in these areas Hershey has waived privilege in each subject matter
> area.

Id. at pp.13-14.

With three exceptions, the defendant responds that the materials produced were not

privileged and, consequently, there was no waiver of the attorney-client privilege.  According to

the defendant:

> Plaintiffs misapprehend the nature of the attorney-client privilege in claiming that Hershey waived the privilege by producing the attorney notes and e-mails. . . .  Such documents do not reflect privileged communications. . . .
>
> The attorney-client privilege does not apply to all documents an attorney prepares.  The mere fact that an attorney was involved in a communication does not automatically render the communication subject to the attorney-client privilege.  Rather, the privilege attaches only to a communication between a lawyer and client that relates to legal advice or strategy sought by the client.

*Response to Motion to Compel Documents* at pp.2-3 (internal quotations and citations omitted).

"[T]he attorney-client privilege can be waived by any voluntary disclosure by the client of an otherwise privileged communication."  Sedillos v. Bd. of Education of School Dist. No. 1, 313 F. Supp. 2d 1091, 1093 (D. Colo. 2004) (internal quotation and citation omitted), *citing* United States v. Bernard, 877 F.2d 1463, 1465 (10th Cir. 1989), and In re M&L Business Machine Co., 161 B.R. 689, 693 (D. Colo. 1993).

I have reviewed Exhibits G through U and, with the exceptions noted below, I agree with the defendant that those materials are not subject to the attorney-client privilege.  Rather, as the defendant argues in its Response, the materials generally are attorney notes of meetings and conversations that document statements and decisions by non-lawyer Hershey employees concerning business decisions (Exhibits G, I, L, M, N, O, P, R, S, T, and U); e-mails between non-lawyer Hershey employees which mention legal matters but do not disclose the substance of any advice requested or given (Exhibits H and J); and a set of e-mails among Hershey employees from which privileged materials have been redacted (Exhibit Q).  Consequently, the production of these non-privileged materials does not waive the attorney-client privilege as to any matter.

24

The materials produced by the defendant and contained in Exhibit K to the Motion to Compel Documents do reveal privileged communications, however.  Exhibit K contains notes made by Jennifer Chung, one of the defendant's attorneys, during a telephone conversation with Mary Oates Walker, the defendant's in-house counsel.  The notes include the following exchange, which the defendant acknowledges is a privileged communication:

> --if group term program, then [Older Workers' Benefit Protection Act] regs [apply]. [D]emog[raphic] info (age) of people selected must be given to [employ]ees. [C]ould expose co. to age claim risk
>
> Selected course: get the data & do some adverse impact analyses to see the extent of risk.

Motion to Compel: Redactions at Exh.K.

The defendant does not seriously dispute that there has been a waiver of the attorney-client privilege as a result of this disclosure, but argues that "if the production of Exhibit K resulted in any waiver of the privilege, the waiver is limited" to the two substantive areas discussed in the notes: (1) "that the OWBPA applies to "group term programs" and (2) "that such programs may give rise to 'age claim risk.'" *Response to Motion to Compel Documents* at p.17.

Similarly, an additional waiver of the attorney-client privilege occurred in connection with the production by Hershey of an e-mail from Mary Oates Walker, Hershey's in-house counsel, to Pat Mooney, which states:

> I am sending you by inter-office mail a copy of a letter from Montagne's counsel dated April 10, 2004 asking that we not destroy certain documents.  The letter is confidential; please do not share it with anyone.  We will likely be requested to produce these documents when this matter proceeds to litigation.  I wanted you to have the list so that Sales HR does not destroy anything that may be requested later.

Motion to Compel Documents at Exh.V.  Again, the defendant does not dispute that this disclosure constitutes a partial waiver of the attorney-client privilege, but argues only that the waiver is limited to "this solitary issue" of "Walker's communications with Mooney relating to document retention after Montagne filed a charge of discrimination against Hershey." *Response to Motion to Compel: Redactions* at p.17.

"Where a party injects part of a communication as evidence, fairness demands that the opposing party be allowed to examine the whole picture." Sedillos, 313 F. Supp. 2d at 1094. Thus, the plaintiffs may inquire into the "subject matter" of the privileged communication. Id. Here, I find that the defendant has waived the attorney-client privilege as to the entirety of the communications made during the selection process concerning (1) whether this case involves a "group term program"; (2) whether the Older Workers' Benefit Protection Act and its implementing regulations apply to the facts of this case, and the exposure of Hershey to an "age claim risk" if the act and regulations do apply; and (3) whether any "adverse impact analyses" were conducted by Hershey in connection with its 2003 Sales Force Early Retirement Plan.  I find also that the defendant has waived to attorney-client privilege as to (4) the communications between Mary Oates Walker and Pat Mooney concerning Hershey's document retention after Mr. Montagne filed his charge of discrimination.  The defendant shall produce on or before August 7, 2006, all additional materials concerning these topics.  In addition, the plaintiffs may inquire during the deposition of Jennifer Chung, required earlier in this Order, about the topics waived by the production of Exhibit K.

I agree with the defendant, however, that the waiver of the attorney-client privilege by the production of Exhibits K and V is limited to the narrow subjects of those exhibits, and does not

constitute the sweeping waiver suggested by the plaintiffs.  See United States v. Bernard, 877

F.2d 1463, 1465 (10th Cir. 1989)(recognizing that a waiver of the attorney-client privilege by

disclosure is limited to the subject matter of the information disclosed); Sedillos, 313 F. Supp. 2d

at 1094 (holding that the "scope of the waiver turns on the scope of the client's disclosure").

**3.   Waiver By Asserting Affirmative Defenses**

The plaintiffs argue:

> Hershey has also waived attorney-client privilege by having gone
> well beyond the mere denial of Plaintiffs' allegations and
> affirmatively asserting as its Fourteenth Defense that Hershey
> "made good faith efforts to comply with all applicable
> antidiscrimnation [sic] laws," and by affirmatively asserting as its
> Fifteenth Defense that it ". . . exercised reasonable care to prevent
> and promptly to correct any discriminatory behavior."

Motion to Compel Documents at p.14.

The theory underlying this part of the plaintiffs' motion to compel, sometimes referred to

as the "in issue doctrine," has been described as follows:

> [T]he "in issue" doctrine should be construed narrowly to create an
> implied waiver of the attorney-client privilege only when a party
> puts "in issue" the *contents* of an attorney-client communication.
> This will occur only when the party has asserted a claim or defense
> that he intends to prove by disclosure of an attorney-client
> communication.

North River Ins. Co. v. Philadelphia Reinsurance Corp., 797 F. Supp. 363, 370 (D. N.J.

1992)(internal quotations and citations omitted; original emphasis).  The "in issue doctrine" does

not give rise to an implied waiver of the attorney-client privilege, however, "when a defendant

pleads an affirmative defense but does not rely on privileged attorney-client communications to

27

prove that defense." <u>Chamberlain Group v. Interlogix, Inc.</u>, 2002 WL 467153 *4 (N.D. Ill. March 27, 2002).

Here, the plaintiffs have failed to come forward with any indication that the defendant intends to prove its fourteenth and fifteenth affirmative defenses through the introduction of privileged communications, and the defendant states unequivocally that it will not.  *Response to Motion to Compel Documents* at p.15 (stating that "[t]here is no evidence that Hershey intends to prove the Defenses through disclosure of privileged communications, because Hershey does not intend to do so").

**4.  Crime/Fraud/Tort Exception to the Attorney-Client Privilege**

The plaintiffs argue, but without any reference to substantiating evidence, that the defendant "purposely and knowingly failed to comply with the explicit mandates of the OWBPA," Motion to Compel Documents at p.15; and "misled the Plaintiffs by representing that by signing the ERP agreement they would be releasing 'all legal claims.'" <u>Id</u>.  In addition, the plaintiffs argue that the defendant improperly "destroyed selective documents throughout the entirety of the employee selection process affecting the Plaintiffs," in violation of ADEA regulations.  <u>Id</u>. at p.16. Based on these unsubstantiated claims, the plaintiffs argue:

> Any attorney-client communications relating to the involuntary retirement scheme, the plan to not comply with the OWBPA, the plan to destroy documents in contravention of the ADEA regulations, and the scheme to misrepresent the legal release terms cannot be privileged, because they are part and parcel of the ongoing or future crime/fraud/tort exception to the privilege.

<u>Id</u>. at 16.

The crime-fraud exception to the attorney-client privilege is defined as follows:

> [T]he attorney-client privilege does not apply where the client consults an attorney to further a crime or fraud. It is the purpose of the crime-fraud exception to the attorney-client privilege to assure that the seal of secrecy between lawyer and client does not extend to communications made for the purpose of getting advice for the commission of a fraud or crime. . . .
>
> To invoke the crime-fraud exception, the party opposing the privilege must present prima facie evidence that the allegation of attorney participation in the crime or fraud has some foundation in fact. The evidence must show that the client was engaged in or was planning the criminal or fraudulent conduct when it sought the assistance of counsel and that the assistance was obtained in furtherance of the conduct or was closely related to it.

In re: Grand Jury Subpoenas, 144 F.3d 653, 660 (10th Cir. 1998)(internal quotations and citations omitted). For the crime-fraud exception to apply, the party opposing the privilege must present prima facie evidence that the allegation of attorney participation in the underlying crime or fraud has some basis in fact. See Berroth v. Farm Bureau Mutual Ins. Co., 2002 WL 1774055 (D. Kan. July 17, 2002) at n.2.

The plaintiffs have failed to meet their burden of showing either the commission of a crime or fraud by the defendant or that Hershey's attorneys participated in any such underlying crime or fraud.

**5. Review of Suspicious Redactions**

Finally, the plaintiffs request that I review certain "suspicious" redactions made by the defendant, arguing:

> [R]edactions to two documents [attached to the Motion to Compel Documents as Exh.G at pp.H30375-76] are particularly suspicious. In one, notes of Ms. Walker dated February 14, 2003, of a meeting with two human resources officials about the forthcoming sales

29

> reorganization, Hershey redacted four sets of words in the left hand margin next to the names of two Plaintiffs (Mr. Montagne and Mr. Leger), and the two former Texas Plaintiffs (Mr. Ott and Mr. Steidl).  Right above these redactions in the same left-hand margin next to a female employee's name are words which are not redacted, and they say "only female RM currently."  Clearly, then, Ms. Walker was taking note of gender and age issues of the region managers, or some other improper criterion.  In fact, when asked in her deposition to describe the general topic of what Hershey redacted from the notes relative to the four older males who Hershey later illegally fired, she admitted that the general topic was "risk."

Motion to Compel Documents at p.17.  The plaintiffs also ask that I review "redaction of documents Plaintiffs subpoenaed from a former Hershey human resources executive, Linda Strange," because the defendant "did not indicate on the copies that information had been redacted, and did not disclose to Plaintiffs that [it] had redacted anything from the notes."  Id.

The redactions made to pages H30375-76 of Exhibit G are identified on the defendant's privilege log as subject to the attorney-client privilege because they contain legal advice from Hershey's in-house counsel, Mary Oates Walker, concerning selection decisions.  The plaintiffs do not provide any evidence to the contrary, nor do they advance a basis for finding that the asserted privilege has been waived.

Although the documents produced by Linda Strange apparently do not show on their face the redactions that were made, the defendant's counsel specified the redactions in detail during Ms. Strange's deposition.  The redactions are identified on the defendant's privilege log, see Motion to Compel Documents, Exh.B at p.29, as subject to the attorney-client privilege.  Two of the redactions concern "communications with Mary Oates Walker, Esq.," Hershey's in-house counsel.  Id. at Bates No. H28636-37.  As to those redactions, the plaintiffs do not provide any

evidence controverting the nature of the material withheld, nor do they advance a basis for finding that the asserted privilege has been waived.

The third redaction, found on the document bearing Bates No. H28638, is withheld on a claim of attorney-client privilege because it reflects "issues that Linda Strange intended to discuss with Mary Oates Walker, Esq." Id. The attorney-client privilege extends only to "the giving of professional advice to those who can act on it [and] also the giving of information to the lawyer to enable him to give sound and informed advice." Sprague v. Thorn Americas, Inc., 129 F.3d 1355, 1370 (10th Cir. 1997). I am aware of no authority that extends the attorney-client privilege to information "intended" to be given to a lawyer but not actually communicated, and the parties have not directed me to any. Consequently, the defendant has failed to establish that the information redacted from the page bearing Bates No. H28638 is subject to the attorney-client privilege, and that document must be produced in its entirety.

The plaintiffs also move for an order requiring the defendant to produce unredacted versions of documents from which the defendant redacted irrelevant material, arguing:

> There is no justifiable reason for Hershey to redact any information
> from relevant documents based on a unilateral claim of irrelevancy,
> and this is particularly improper given the strict terms and
> conditions of the Stipulated Protective Order.

Motion to Compel Documents at p.18. The argument lacks merit.

Rule 26(b), Fed. R. Civ. P., permits the discovery of matters "relevant to the claim or defense of any party" and information "reasonably calculated to lead to the discovery of admissible evidence." The plaintiffs are not entitled to the discovery of irrelevant information. Nor does the existence of a stipulated protective order designed to limit the disclosure of

confidential information, as was entered here, <u>see</u> Stipulated Protective Order [Doc. # 24, filed

1/16/2005], alter the analysis.

## CONCLUSION

IT IS ORDERED that the Motion to Compel Third Set is DENIED.  At the time the

plaintiffs served their third set of discovery, they were entitled to serve an additional 27

production requests.  Consequently, on or before **July 21, 2006**, the plaintiffs shall designate the

27 distinct production requests for which they seek responses; and the defendant shall respond to

those 27 distinct requests on or before **August 7, 2006**.  If the plaintiffs fail to make the required

designation by July 21, 2006, the defendant shall respond to the first 27 distinct subparts in the

third production request on or before August 7, 2006.

IT IS FURTHER ORDERED that the Motion to Compel Chung Deposition is

GRANTED.  Ms. Chung shall make herself available for a deposition in Denver, Colorado, in my

jury deliberation room at the Alfred A. Arraj United States Courthouse, 901 19th Street, Denver,

Colorado, at a date and time as the parties may agree, but in no event later than

**August 18, 2006**.  The deposition shall not exceed four hours in length and shall be taken in a

single day.

IT IS FURTHER ORDERED that the Motion to Compel Documents is GRANTED IN

PART and DENIED IN PART as follows:

GRANTED to require the defendant to produce all documents, including documents

otherwise subject to the attorney-client privilege, containing communications made during the

selection process concerning (1) whether this case involves a "group term program"; (2) whether

the Older Workers' Benefit Protection Act and its implementing regulations apply to the facts of

this case, and the exposure of Hershey to an "age claim risk" if the act and regulations do apply;

(3) whether any "adverse impact analyses" were conducted by Hershey in connection with its

2003 Sales Force Early Retirement Plan; and (4) communications between Mary Oates Walker

and Pat Mooney concerning Hershey's document retention after Mr. Montagne filed his charge of

discrimination.  All responsive documents shall be produced on or before **August 7, 2006**;

GRANTED to require the defendant to produce an unredacted copy of the document

bearing Bates No. H28638.  The document shall be produced on or before **August 7, 2006**; and

DENIED in all other respects.

Dated July 13, 2006.

BY THE COURT:

 s/ Boyd N. Boland
United States Magistrate Judge